FILED

2011 AUG 17 PM 3: 06

CLERK U S DISTRICT COURT
CENTRAL DIST. C CALIF.
LOS ANGELE

BY _____

Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| DAN KATZ, PETER VAN NUIS AND JULIUS SHAPIRO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>vs.<br><br>CHINA CENTURY DRAGON MEDIA, INC., HAIMING FU, DAPENG DUAN, HUHUA LI, ZHIFENG YAN, DAVID DE CAMPO, YUE LU, FANG YUAN, WESTPARK CAPITAL, INC., JOSEPH GUNNAR & CO, LLC, I-BANKERS SECURITIES, INC., AEGIS CAPITAL CORPORATION, RICHARD RAPPAPORT, AND MALONEBAILEY LLP,<br><br>Defendants. | CASE No.: 11-CV-2769 (JAK) (SSx)<br><br>*FIRST* AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Dan Katz and named plaintiffs Peter Van Nuis and Julius Shapiro ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange

1

Commission ("SEC") filings, wire and press releases published by and regarding China Century Dragon Media, Inc., ("China Dragon", or the "Company"), securities analysts' reports and advisories about the Company, China Dragon's filings with the State Administration for Industry and Commerce (the "SAIC") in the People's Republic of China (the "PRC"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased China Dragon common stock in the Company's public offering (the "Offering") on February 7, 2011 or purchased China Dragon stock in the aftermarket pursuant, and/or traceable to, the Company's registration statement and public offering prospectus issued in connection with the Offering during the period from February 7, 2011 through March 21, 2011 (the "Class"). This Complaint seeks to recover damages to Class members caused by defendants' violations of federal securities laws and to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.     China Dragon is a Delaware corporation that purportedly engages in the prepackaging and resale of advertising time on China Central Television ("CCTV"). Substantially all of China Dragon's operations occur through Beijing CD Media Advertisement Co., Ltd. ("CD Media Beijing"), a company incorporated under the laws of the People's Republic of China ("PRC").

3.     Due to limitations imposed by PRC law, China Dragon does not have direct equity ownership of CD Media Beijing. Instead, Huizhou CD Media Co, Ltd. ("CD Media Huizhou"), a PRC company wholly owned by China Dragon, has a series of contractual relationships with the equity owners of CD Media Beijing that

provide it with effective control of over the operations of CD Media Beijing and the economic benefits derived therefrom.

4.     The equity owners of CD Media Beijing, HuiHua Li, ZhiFeng Yan and HaiMing Fu, are also directors and/or officers of China Dragon.

5.     The corporate structure of China Dragon is discussed more fully below and is also depicted visually on the chart in Exhibit 1 attached hereto.

6.     On February 4, 2011, China Dragon filed an amended registration statement on Form S-1/A with the SEC (the "Registration Statement"). The Registration Statement contained two preliminary prospectuses, both of which form an integral part of the Registration Statement. The first prospectus was for the public offering of China Dragon's common stock. The second prospectus, which incorporated by reference all relevant parts of the public offering prospectus and included only those pages which were materially different from the public offering prospectus, was to be used for the resale of up to 1,034,403 shares of China Dragon stock purchased by investors in a private placement in April 2010 (the "Resale").

7.     The Resale did not occur, and none of these private placement shares entered the public market, as the resale prospectus contained in the Registration Statement never became effective.

8.     The Registration Statement became effective at 4:30 p.m. EST on February 7, 2011. On February 8, 2011, pursuant to Rule 424(b)(4) of the Securities Act, China Dragon filed the final version of the public offering prospectus contained in the Registration Statement (the "Prospectus"), which had an effective date of February 7, 2011.

9.     WestPark Capital, Inc., Joseph Gunnar & Co., LLC, I-Bankers Securities, Inc., and Aegis Capital Corporation underwrote the Offering (collectively, the "Underwriters" or the "Underwriter Defendants").

10.     The Prospectus solicited investors for a public offering of 1,200,000 shares at $5.25 per share, and included an over-allotment option of 180,000 shares to be exercised per the Underwriter's discretion within 45 days of the Offering.

11.     The Registration Statement and Prospectus contained China Dragon's consolidated financial statements for fiscal years 2009, 2008, and 2007 (the "Consolidated Financial Statements"), and the expert opinion of MaloneBailey LLP, which served as the Company's independent registered public accounting firm and audited the Company's financial statements for fiscal years 2009 and 2008.

12.     The Consolidated Financial Statements, and, by extension, the Registration Statement and Prospectus, contained untrue statements of material fact. Namely, the Consolidated Financial Statements grossly overstated the amount of revenue, gross profit, income from operations, and net income generated by the Company during the fiscal years 2009 and 2008 (the "False Financial Statements"). Indeed, the Registration Statement and Prospectus overstated the revenue generated by the Company for fiscal year 2009 by over 700%; gross profit by over 5,500%; income from operations by over 75,000%; and net income by over 55,000%.

13.     The False Financial Statements are untrue because they do not comport with the CD Media Beijing's filings with the State Administration for Industry and Commerce ("SAIC") in the PRC.

14.     As described in more detail below, the SAIC is a Chinese governmental body charged with regulating businesses in the PRC.

15.     For both the reasons denoted in this complaint, and by the Company itself in the Registration Statement and Prospectus, CD Media Beijing's SAIC filings indicate the true financial performance of China Dragon.

16.     Because the False Financial Statements in the Registration Statement and Prospectus indicate drastically higher revenue, gross profit, income from operations, and net income for fiscal years 2009 and 2008 than the Company's SAIC filings, they are untrue. As a result, the Registration Statement and

Prospectus, which include the False Financial Statements, contain untrue statements of material fact.

17.     On March 21, 2011, NYSE Amex LLC (the "Amex") halted trading in the Company's common stock. The following day, China Dragon issued a press release indicating that it had received a preliminary information request from the NYSE Amex, and that the latter requested that the Company provide responsive information by March 24, 2011.

18.     Then, on March 28, 2011, China Dragon issued a report on Form 8-K with the SEC indicating, among other things,

    a.    that the Amex had initiated immediate delisting proceedings against the Company in order to protect investors and strike China Dragon's common stock from the exchange;

    b.    that MaloneBailey resigned as the Company's auditor on March 22, 2011;

    c.    that MaloneBailey's resignation letter (the "Resignation Letter") indicated that:

        i.    MaloneBailey had repeatedly raised concerns to the Company that its accounting records had been falsified;

        ii.    that MaloneBailey, during the course of its audit for fiscal year 2010, uncovered discrepancies in the Company's customer confirmations and that it was unable to directly verify the Company's bank records;

        iii.    that the Company refused to provide a satisfactory explanation for said discrepancies;

        iv.    that the Company also refused to provide authorization for MaloneBailey to obtain official bank records from China Dragon's bank's record keeping systems;

Amended Class Action Complaint for Violation of the Federal Securities Laws

v.   and that, due to the above, it was withdrawing its audit opinion, as expressed in the Registration Statement and Prospectus, with respect to its audits of the consolidated financial statements of the Company for fiscal years ended December 31, 2009 and 2008, which were incorporated in the Registration Statement and Prospectus, and that these should no longer be relied upon (i.e., two of the three review years constituting the Consolidated Financial Statements, which contained the False Financial Statements)

d.   and that the SEC had initiated a formal, nonpublic investigation into whether the Company had made material misrepresentations and/or omissions in its financial statements.

19.   On June 13, 2011, the SEC issued a press release announcing that it had initiated proceedings in order to issue a stop order preventing any further sales of China Dragon stock under the Company's "materially misleading and deficient offering documents" (i.e., the Registration Statement and Prospectus).

20.   The contents of the Company's March 28, 2011 8-K, including its summary of MaloneBailey's Resignation Letter (the full text of which has not been disclosed), as well as the contents of the SEC's June 13, 2011 press release and the Order and Statement of Matters referenced therein, further underscore that the Registration Statement and Prospectus contained untrue statements of material fact.

21.   On June 17, 2011, the Company filed a statement on Form 8-K announcing that the Amex had suspended China Dragon's listing with the Exchange effective as of that day, and that the Company's stock would be eligible to trade on the so-called "grey sheets."

22.   Because the Registration Statement and Prospectus contained untrue statements of material fact; because trading in China Dragon's stock was halted

very shortly after the Offering and eventually delisted from the Amex; because the Company's auditor resigned due to perceived forgeries in the Company's accounting records and the Company's failure to address the auditor's concerns and provide bank records; because the SEC subsequently initiated proceedings against the Company based on the allegation that the Registration Statement and Prospectus contained untrue statements of material fact; and because the value of the Company's stock, which currently trades at $0.30 per share, has declined by nearly 95% from its Offering price of $5.25 per share; Plaintiffs and the Class have suffered damages for violations of sections 11, 12(a)(2) and 15 the Securities Act.

## JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77(o)).

24.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v(a).

25.     Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a).  Pursuant to 28 U.S.C. § 1391(d), China Dragon may be properly sued in any District in the United States, including the Central District of California.  The lead underwriter, Westpark, is domiciled and underwrote the Offering in this district. Moreover, the relative proximity of Los Angeles to China makes it a convenient venue for defendants, the majority of which reside in the PRC.

26.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

16.    Lead Plaintiff Dan Katz purchased China Dragon common stock pursuant and/or traceable to the Offering. Mr. Katz' PSLRA certification was previously filed with the Court.

17.    Plaintiffs Peter Van Nuis and Julius Shapiro purchased China Dragon common stock pursuant and/or traceable to the Offering. Their PSLRA certifications are attached hereto.

18.    Defendant China Dragon is a Delaware Corporation with its principal executive offices in Guangdong Province, China.  China Dragon purports to be a television advertising Company in China.

19.    China Dragon signed the Registration Statement through its Chief Executive Officer, HaiMing Fu.

20.    Defendant HaiMing Fu ("Fu") was at all relevant times China Dragon's Chief Executive Officer ("CEO"), and signed the Company's Registration Statement in connection with the Offering.

21.    Defendant Dapeng Duan ("Duan") was at all relevant times China Dragon's Chief Financial Officer and Corporate Secretary, and signed the Company's Registration Statement in connection with the Offering.

22.    Defendant HuiHua Li ("Li") was at all relevant times China Dragon's Chairman of the Board; and signed the Company's Registration Statement in connection with the Offering.

23.    Defendant Zhifeng Yan ("Yan") was at all relevant times a director of China Dragon, and signed the Company's Registration Statement in connection with the Offering.

24.    Defendant David De Campo ("De Campo") was a director of China Dragon from November 2010, and signed the Company's Registration Statement in connection with the Offering.  On March 21, 2011, the Company filed a statement on Form 8-K indicating that De Campo had resigned from his position with the

Company effective March 15, 2011, stating that "the language barrier and his remote location made it impossible for him to perform his duties."

25. Defendant Yue Lu ("Lu") was at all relevant times a director of China Dragon, and signed the Company's Registration Statement in connection with the Offering.

26. Defendant Fang Yuan ("Yuan") was at all relevant times a director of China Dragon, and signed the Company's Registration Statement in connection with the Offering.

27. Defendants Fu, Duan, Li, Yan, De Campo, Lu, and Yuan are collectively referred to as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement and was either a director or officer of the Company at the time it filed the Registration Statement with the SEC.

28. Defendant WestPark Capital ("WestPark"), Inc. is a full service investment banking company. WestPark's headquarters are located at 1900 Avenue of the Stars, Suite 310, Los Angeles, CA 90067. WestPark was an underwriter of the Offering, selling 500,000 of the total number of shares sold in the Offering.

29. WestPark had significant control over China Dragon prior to the Offering. WestPark and its affiliates, including Westpark's CEO, Richard Rappaport, were significant shareholders of SKRP 25, Inc. ("SKRP"), the shell company that eventually became China Dragon through a reverse merger transaction on April 30, 2010 (the "Reverse Merger")[1]. Just prior to the Reverse Merger between SKRP and CD Media (Holding) Co., Limited ("CD Media BVI"), the shareholders of SKRP cancelled some of their outstanding shares and warrants of SKRP such that there were 767,345 shares and 411,611 one-to-one warrants of

---

[1] In a reverse merger, a shell company acquires a private company, and, in exchange, the former shareholders of the private company receive a controlling share of the shell company. The general purpose of the reverse merger process is for a private company to go public, either by merging into a shell company that is already publicly traded, or fit to be publicly traded.

SKRP, exercisable at $.003 per share, outstanding just prior to the Reverse Merger (the "Former Shareholder's Shares").

30.     After the reverse merger, of the Former Shareholder's Shares, WestPark and its affiliates controlled 650,941 shares and 366,034 warrants; or, in other terms, approximately 13.2% of the Company. The Former Shareholder's Shares were not registered, and the parties holding the Former Shareholder's Shares had agreed not to trade or otherwise dispose of said shares until at least 6 months after the Offering.

31.     In addition, WestPark was China Dragon's placement agent for its April 30, 2010 private placement of 1,034,403 shares at $5.17 per share (the "Private Placement"). These shares were to be registered and resold pursuant to the Resale, constituted an integral part of the Company's financing of which the Offering was a part, and were subject to the provisions of the lock-up agreement described in the Registration Statement and Prospectus. The nature of the lock-up agreement was such that, due to the size of the Offering, 10% of the Private Placement shares would become tradable 90 days after the effective date of the Offering, with a pro rata release of shares every 30 days thereafter. The Resale did not occur before or during the Class Period.

32.     Defendant Joseph Gunnar & Co., LLC ("Gunnar") is a full service broker dealer.  Gunnar's headquarters are located at 30 Broad Street, 11th Floor, New York, New York.  Gunnar was an underwriter of the Offering, selling 275,000 of the total number of shares sold in the Offering. Due to the conflict of interest stemming from WestPark's and WestPark affiliates' ownership stake in the Company, Gunnar acted as the independent underwriter for the Offering.

33.     Defendant I-Bankers Securities, Inc. ("I-Bankers") is a full service investment banking company.  I-Bankers' headquarters are located at 6303 Owensmouth Ave, 10th Floor, Woodland Hills, CA 91367.  I-Bankers was an

underwriter of the Offering, selling 275,000 of the total number of shares sold in the Offering.

34.    Defendant Aegis Capital Corporation ("Aegis") is a private equity firm.   Aegis' headquarters are located at 810 7th Avenue, 11th Floor, New York, NY 10019. Aegis was an underwriter of the Offering, selling 150,000 of the total number of shares sold in the Offering.

35.    Defendant Richard Rappaport ("Rappaport") is, and at all relevant times was, the Chief Executive Officer of WestPark, and, as indicated by the Registration Statement and Prospectus, the "sole owner of the membership interests in the parent of WestPark Capital." In layman's terms, Rappaport is the sole owner of WestPark, and thereby exerts complete control over WestPark.  Rappaport was the President of SKRP prior to the Reverse Merger, and beneficially owned approximately 11.5% of China Dragon just prior to the IPO (this figure counts his indirect beneficial ownership of China Dragon stock through two separate trusts and through his ownership of WestPark).

36.    Defendant MaloneBailey LLP ("MaloneBailey") became the Company's independent registered public accountant on April 30, 2010 concurrently with the closing of the Private Placement and the Reverse Merger transaction.

37.    Prior to April 30, 2010, and at minimum through the date of the Offering, MaloneBailey was the independent registered public accountant for China Media BVI, the China Dragon's predecessor entity with which China Dragon consummated the Reverse Merger transaction.

38.    The Registration Statement and Prospectus contained a report by MaloneBailey (the "Auditor's Report"), which indicated that it had audited the consolidated balance sheets of China Dragon for fiscal years 2009 and 2008 (with fiscal years ending December 31), and the consolidated statements of operations

and comprehensive income, changes in shareholders' equity and cash flows for fiscal years 2009, 2008, and 2007. The Auditor's Report stated that:

> "In [MaloneBailey's] opinion, the financial statements of the Company referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2009 and 2008 and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America."

39.    The Registration Statement and Prospectus, under a section heading entitled "Experts," indicated that:

> "The (i) consolidated financial statements of China Century Dragon Media, Inc. as of December 31, 2009 and 2008 and for the years ended December 31, 2009, 2008 and 2007 (ii) condensed parent-only balance sheet China Century Dragon Media, Inc. as of December 31, 2009 and 2008, and the related condensed parent-only statements of income and cash flows for the years ended December 31, 2009, 2008 and 2007 included in footnote 14 to the Consolidated Financial Statements of China Century Dragon Media, Inc., each appearing in this prospectus and registration statement have been audited by MaloneBailey, LLP, an independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and *are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing*." [emphasis added]

## DEFENDANTS' UNTRUE STATEMENTS IN THE REGISTRATION STATEMENT AND PROSPECTUS

### China Dragon's Corporate Structure

40.    China Dragon's predecessor, SKRP 25, Inc., was a shell company incorporated in the State of Delaware on December 17, 2007. On March 31, 2010, SKRP entered into a share exchange agreement with CD Media (Holding) Co., Limited (CD Media BVI, a British Virgin Islands Corporation), CD Media BVI's shareholders, Huizhou CD Media Co., Ltd. (CD Media Huizhou, a PRC

corporation), and Beijing CD Media Advertisement Co., Ltd (CD Media Beijing, a PRC corporation). Pursuant to the share exchange agreement, SKRP would issue 5,539,000 shares of its common stock in return for all of the issued and outstanding securities of CD Media BVI, which would then become the wholly owned subsidiary of the Company.

41.     On April 30, 2010, the terms of the share exchange agreement were effectuated, thereby consummating the Reverse Merger transaction; SKRP immediately changed its name to China Century Dragon Media, Inc., and CD Media BVI became China Dragon's wholly owned subsidiary. The shares exchanged in the Reverse Merger transaction were not registered, and could not, and were not, traded during the Class Period.

42.     As indicated by the Registration Statement and Prospectus, CD Media BVI has two subsidiaries, both of which are wholly owned: CD Media Huizhou and CD Media (HK) Limited ("CD Media HK," a Hong Kong Corporation). China Dragon, the Delaware Corporation, has no other subsidiaries except for CD Media BVI, and operates exclusively through that subsidiary (i.e., China Dragon has no operations outside of CD Media BVI). China Media HK is a holding company that had no operations as of the date of the Offering.  As a result, all of CD Media BVI's substantial operations, and by extension all of China Dragon's substantial operations, occur through CD Media Huizhou.

43.     A diagram of China Dragon's corporate structure and ownership of its subsidiaries is attached as Exhibit 1 and incorporated by reference herein.

44.     Due to certain PRC laws, rules, and regulations, China Dragon is unable to own a direct interest in a company providing advertising services in the PRC.  CD Media Huizhou is a "wholly-foreign owned enterprise" in the PRC. According to the Registration Statement and Prospectus, China Dragon cannot, and does not, directly operate its PRC advertising business through CD Media Huizhou. CD Media Huizhou does not, and cannot have substantial operations of its own

because the Registration Statement and Prospectus indicate that all of China Dragon's substantial operations are constituted by its PRC advertising business, which cannot be directly operated by CD Media Huizhou.

45.     Instead, CD Media Huizhou has a series of contractual relationships with CD Media Beijing that provide it, and by extension China Dragon, with effective control of CD Media Beijing and its economic benefits.

46.     Defendants Fu (5%), Li (95%), and Yan (5%) collectively hold a 100% equity interest in CD Media Beijing. On March 30, 2010, CD Media Huizhou and CD Media Beijing entered into an exclusive business cooperation agreement, pursuant to which CD Media Beijing agreed to pay a percentage of its yearly income as an annual service fee to CD Media Huizhou for a period of 10 years. The two entities then entered into an equity pledge agreement on July 30, 2010, by which the shareholders of CD Media Beijing (i.e., defendants Fu, Li, and Yan) pledged all of their equity interest in CD Media Beijing to CD Media Huizhou. The shareholders of CD Media Beijing also granted CD Media Huizhou power of attorney for all matters relating to the shareholders' equity interest in CD Media Beijing.

47.     As CD Media Beijing is the only entity controlled by China Dragon that can, and purportedly did, have advertising operations in the PRC; and because China Dragon's substantial operations are constituted solely by its advertising business in the PRC; CD Media Beijing's operations did and do constitute all of China Dragon's substantial operations.

48.     Furthermore, the Registration Statement and Prospectus indicate that "all of CD Media Huizhou's revenue is generated from the service fees paid to it by CD Media Beijing pursuant to the contractual arrangements." As CD Media HK, CD Media BVI's other subsidiary, has no operations; and as CD Media BVI has no operations outside of its two subsidiaries, CD Media HK and CD Media Huizhou;

Amended Class Action Complaint for Violation of the Federal Securities Laws

the revenue generated by CD Media Huizhou through its contractual relationship with CD Media Beijing constitutes the sole source of revenue for CD Media BVI.

49.     Since China Dragon has no operations outside of CD Media BVI, its wholly owned subsidiary, the contractual relationship between CD Media Huizhou and CD Media Beijing is the sole source of revenue for China Dragon.

50.     Thus, China Dragon's yearly revenue cannot, and should not, be greater than the yearly revenue of CD Media Beijing.

51.     Moreover, as China Dragon has no source of revenue outside of the contractual relationship between CD Media Huizhou and CD Media Beijing, its yearly figures for gross profit, income from operations, and net income cannot, and should not be higher than those of CD Media Beijing.

***Veracity of CD Media Beijing's SAIC Filings***

52.     The SAIC (State Administration for Industry and Commerce) is the Chinese government body that regulates industry and commerce in China.  It is primarily responsible for business registrations, issuing and renewing business licenses and acts as the government supervisor of corporations. All Chinese companies are required to file financial statements with the Chinese government annually or bi-annually.

53.     CD Media Beijing's filings with the SAIC accurately reflect its true financial condition for the following reasons:

    a. Under PRC law, penalties for filing false SAIC filings include fines and revocation of the entity's business license.[2]

    b. If an entity's business license is revoked, the People's Bank of China[3] requires all bank accounts of that entity be closed.[4]

---

[2] "Measures for the Annual Inspection of Enterprises" issued on February 24, 2006, Article 20.

[3] People's Bank of China in PRC is equivalent to the Federal Reserve in the U.S.

[4] "Measures for the Administration of RMB Bank Settlement Accounts" issued in

c. Without a business license the entity cannot legally conduct any business.

54.    Furthermore, the Registration Statement and Prospectus indicate the importance of accurate SAIC filings, and the severe penalties for inaccurate filings:

"Any company that conducts business in the PRC must have a business license that covers a particular type of work. Pursuant to PRC regulations governing the advertising businesses, including the Advertising Law promulgated by the National People's Congress on October 27, 1994 (the "1994 Advertising Law"), the Advertising Administrative Regulations (1987) and the Implementing Rules for the Advertising Administrative Regulations (2004), advertising companies must obtain a business license for its advertising activities from the State Administration for Industry and Commerce (the "SAIC") or its local branches. CD Media Beijing's business license covers its present business to design, create, handle (as agent), and release advertisements in the PRC for domestic and foreign investors; to arrange cultural communications (excluding shows); to undertake exhibitions and presentations; and to provide advertising consulting services (excluding intermediary services). CD Media Huizhou's business license permits CD Media Huizhou to design, handle (as agent) and organize cultural communications (excluding news releases and advertisement making), provide cultural consulting services and to design images for advertising. Companies that operate outside the scope of their licenses can be subjected to fines, disgorgement of income and ordered to cease operations."

***

"The 2009 Administration of Advertisement Broadcasting of Radio and Television also provides that registration review and filing systems must be established and maintained for all advertising businesses. Advertising fees must be reasonable and rates and fee collection methods must be filed with the PRC Commodity Price Administration and the SAIC. Under the Implementation Rule of Advertising Industry Administration,

April 2003. (No.5 [2003]), Article 49.

or the Implementation Rule, promulgated by the SAIC, as amended, the advertising agent fee may not be more than 15% of the advertising fees. The advertising customer must provide relevant documents, including certificates rendered by relevant supervisory administrations before we can deliver or place its advertisements."

***

In circumstances involving serious violations, the SAIC or its local branches may revoke violators' licenses or permits for their advertising business operations.

[emphasis added]

*False Financial Statements*

55.    CD Media Beijing's filings with the SAIC are accurate because, *inter alia*, CD Media Beijing would lose its business license if its SAIC filings were inaccurate. If CD Media Beijing lost its business license, it would no longer be able to conduct advertising operations in the PRC. Advertising operations in the PRC constitute CD Media Beijing's and by extension China Dragon's sole business operations. Thus, the loss of CD Media Beijing's business license would effectively halt all business operations by the Company.

56.    The following chart details: (1) China Dragon's consolidated revenue, gross profit, income from operations, and net income for fiscal years ended December 31, 2009 and 2008, which were reported in the Consolidated Financial Statements contained in the Company's Registration Statement and Prospectus, and audited by MaloneBailey (the False Financial Statements); (2) the revenue, gross profit, income from operations, and net income for CD Media Beijing as reported in CD Media Beijing's SAIC filings for fiscal years ended December 31, 2009 and 2008 (the "True Financial Statements"); and (3) the discrepancy between (1) and (2) as a percentage of (2).[5]

---

[5] All figures are USD in thousands; assume an exchange rate of 6.92 for the year ended December 31, 2008, and an exchange rate of 6.83 for the year ended

| (1) False Financial Statements filed with SEC | | |
|---|---|---|
| USD in thousands | 2009 | 2008 |
| Revenue | $74,480 | $44,684 |
| Gross Profit | $14,734 | 8,186 |
| Income from Operations | $12,040 | $6,135 |
| Net Income | $9,010 | $4,605 |
| (2) True Financial Statements filed with SAIC | | |
| Revenue | $9,536 | $15,123 |
| Gross Profit | $263 | $367 |
| Income from Operations | $16 | $(10) |
| Net Income | $16 | $(12) |
| (3) Percentage Discrepancy | | |
| Revenue | 681% | 195% |
| Gross Profit | 5,502% | 2,131% |
| Income from Operations | 75,150% | -- |
| Net Income | 56,213% | -- |

57.     The True Financial Statements are taken from CD Media Beijing's SAIC filings, which are veracious for the reasons enumerated above. Due to the

December 31, 2009; parentheses signify loss.

nature of China Dragon's corporate structure, the consolidated revenue, gross profit, income from operations, and net income reported by China Dragon cannot, and should not be higher than the revenue, gross profit, income from operations, and net income reported by CD Media Beijing. Thus, the False Financial Statements are untrue because they report materially higher consolidated revenue, gross profit, income from operations, and net income for China Dragon than CD Media Beijing reported to the SAIC.

58.   The False Financial Statements formed a part of the Consolidated Financial Statements that were audited and certified by MaloneBailey (i.e., fiscal years 2009 and 2008). The False Financial Statements were contained in China Dragon's Registration Statement and Prospectus. As a result, the Registration Statement and Prospectus contain untrue statements of material fact.

***Other Factors Pointing to Untrue Statements in the Registration Statement and Prospectus***

50.   On March 21, 2011, the Amex halted trading in China Dragon stock. On March 28, 2011, the Company filed a statement on Form 8-K indicating, *inter alia*, that MaloneBailey had resigned as China Dragon's auditor and that the Amex was initiating delisting proceedings against the Company. The reasons cited for MaloneBailey's resignation in the 8-K further underscore the fact that the Registration Statement and Prospectus contain untrue statements of material fact. The 8-K stated, in relevant part:

> "Specifically, MaloneBailey repeatedly raised concerns to the Company's board of directors and management that its accounting records may have been falsified constituting an illegal act. The Company failed to adequately address the concerns raised by MaloneBailey, thereby leading to MaloneBailey's resignation as the Company's independent auditor and the withdrawal of MaloneBailey's audit opinions, as well as a presumption that the concerns raised are true."

***

[China Dragon's] actions and inactions which led to <u>MaloneBailey's resignation and withdrawal of its audit opinions have cast material doubt on the integrity of its financial statements as reasonably relied on for such purposes</u>.

\*\*\*

[China Dragon's] failure to adequately address the matters raised by MaloneBailey to avoid its resignation and withdrawal of its audit opinions <u>raises concerns that the Company's financial statements (which constitute communications provided in connection with its initial listing application and which have been relied on by the Exchange in connection with its ongoing assessment of the Company's continued listing eligibility) contain one or more material misstatements and/or omit material necessary to make the financial statements not misleading</u>.

\*\*\*

The following reportable events occurred within the period from MaloneBailey's engagement and the two fiscal years of the Company ended December 31, 2009 and 2010 and subsequently up to the date of resignation <u>MaloneBailey informed the Company in its resignation letter that due to discrepancies noted on customer confirmations and the auditor's inability to directly verify the Company's bank records, they believe these irregularities may be an indication that the accounting records have been falsified, which would constitute an illegal act</u>. MaloneBailey stated in its letter that the <u>Company's management has not provided a satisfactory explanation of the discrepancies noted on customer confirmations and was unwilling to provide authorization to the bank so that the auditor could obtain official bank records directly from the bank's record keeping system</u>. Furthermore, MaloneBailey's letter notes that the discrepancies could indicate a material error in previously issued financial statements. As a result, MaloneBailey states that it is unable to rely on management's representations as they relate to previously issued financial statements and <u>it can no longer support its opinions related to the financial statements as of December 31, 2009, and 2008</u> [i.e., the same financial statements that were included in the Registration Statement and Prospectus, and which contained the False Financial Statements].

\*\*\*

The Company was also recently notified by the staff of the SEC that it has initiated a formal, nonpublic investigation into whether the Company had made material misstatements or omissions concerning its financial statements, including cash accounts and accounts receivable.
[emphasis added]

51.    Attached as an exhibit to the March 28, 2011 8-K was a letter from MaloneBailey stating the following:

In our resignation letter dated March 22, 2001, we notified the company that due to the accounting irregularities identified during our 2010 audit, and the lack cooperation from the Company's management to resolve the discrepancies noted on customer confirmations and assist us with verifying the Company's bank records, we could no longer rely on management's representations required to support our opinions related to the consolidated financial statements of China Century Dragon Media, Inc. and Subsidiaries as of December 31, 2009 and 2008, included in the Form S-1 filed with the SEC on February 4, 2011; and the consolidated financial statements of CD Media (Holding) Co., Limited and Subsidiaries (the "Company") as of December 31, 2009 and 2008, included in the Form 8-K filed with the SEC on February 2, 2011. We agree with management to file a statement of non-reliance on previously issued financial statements under Item 4.02 of the Form 8-K dated March 28, 2011. [emphasis added]

52.    The reasons given for MaloneBailey's resignation, which include the Company's failure to provide MaloneBailey with access to customer and bank information during the course of its audit; as well as the fact that the Consolidated Financial Statements for fiscal years 2009 and 2008, which contain the above-detailed False Financial Statements, are specifically mentioned as being cast in material doubt; further point to the existence of untrue statements of material fact in the Registration Statements and Prospectus.

53.    On June 13, 2011, the SEC issued a press release announcing that it had instituted proceeding against China Dragon. The reasons for MaloneBailey's

resignation are specifically cited by the SEC in its Order instituting said proceedings, and in the Statement of Matters attached thereto, as a basis for the SEC action.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

54.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this action as a class action on behalf of themselves and all others who purchased China Dragon common stock in the Company's Offering on February 7, 2011 or purchased China Dragon stock in the aftermarket pursuant, and/or traceable to, the Company's Registration Statement and Prospectus issued in connection with the Offering during the period from February 7, 2011 through March 21, 2011 (collectively, the Class).

55.     Excluded from the Class are Defendants, all current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which such excluded persons have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable.   Approximately 1,200,000 shares of the Company's common stock were sold in the Offering.

57.     The precise number of the Class members is unknown to Plaintiffs at this time but it is believed to be in the thousands.  Members of the Class may be identified from records maintained by China Dragon or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

58.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein.

59.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.  whether the provisions of the Securities Act were violated by Defendants' acts as alleged herein;

      b.  whether the Registration Statement and Prospectus issued by Defendants to the investing public omitted and/or misrepresented material facts about the Company and its business; and

      c.  the extent to which members of the Class have sustained damages, and the proper measure of damages.

61.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### FIRST CLAIM
### Violation of Section 11 of the Securities Act
### Against All Defendants Except for Rappaport

62.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is not based on, does not allege, nor does it sound in, fraud.

63.    This Section 11 claim is asserted against all Defendants except for Rappaport.

64.    This claim is brought by Plaintiffs on their own behalf and on behalf of other members of the Class who acquired China Dragon stock in and/or pursuant to or traceable to the Company's Offering.   Each Class Member acquired his, her, or its shares in, pursuant to and/or traceable to, and in reliance on, the Registration Statement and Prospectus.  China Dragon is the issuer of the securities through the Registration Statement and Prospectus.

65.    The Individual Defendants are all signatories of the Registration Statement.

66.    Defendants WestPark, Gunnar, I-Bankers, and Aegis were underwriters of the Offering.

67.    Defendant MaloneBailey was China Dragon's certified independent public accountant at the time of the Offering, audited the Consolidated Financial Statements for fiscal years 2009 and 2008 contained in the Registration Statement and Prospectus, and issued a report included in the Registration Statement and Prospectus, the veracity of said report being based on the authority of MaloneBailey as experts in accounting and auditing.

68.    Each of the Defendants named in this Count owed to the purchasers of the stock obtained through the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

69.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the challenged statements contained in the Registration Statement and Prospectus were true or that

there was no omission of material facts necessary to make the statements made therein not misleading.

70.    Defendants named in this Count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the challenged facts set forth above.  By reason of the conduct alleged herein, each Defendant named in this Count violated and/or controlled a person who violated Section 11 of the Securities Act.

71.    China Dragon is the issuer of the stock sold via the Registration Statement and Prospectus.  As issuer of stock, the Company is strictly liable to Plaintiffs and the Class for the material misstatements and omissions therein.

72.    At the times they purchased their shares of China Dragon, Plaintiffs and members of the Class did so without knowledge of the true facts concerning the misstatements and omissions alleged herein.

73.    This action is brought within one year after discovery of the untrue statements and omissions in the Registration Statement and Prospectus that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement and Prospectus.

74.    By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants named in this Count, and each of them, jointly and severally.

## SECOND CLAIM
### Against Defendants China Dragon and the Underwriters for
### Violation of §12(a)(2) of the Securities Act

75.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This claim is not based on, does not allege, nor does sound in, fraud.

76.     This Count is asserted against Defendants China Dragon and the Underwriters (i.e., Defendants WestPark, Gunnar, I-Bankers, and Aegis) for violations of §12(a)(2) of the Securities Act by plaintiff Peter Van Nuis only on behalf of those members of the Class who purchased China Dragon common stock directly from one of the Underwriters in the Offering at $5.25/share.

59.     Plaintiff Peter Van Nuis purchased 1,000 shares of China Dragon common stock directly from Gunnar in the Offering at a price of $5.25/share.

60.     Each of the Defendants was a seller, offeror, and/or solicitor of sales of the shares offered in connection with the Offering as defined under §12(a)(2) of the Securities Act and pertinent common law.

61.     The Prospectus contained misstatements of material facts, and omitted to state facts necessary to make the statements made therein not misleading, concerning China Dragon's business and financial condition, as alleged above.

62.     Each of the Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus and soliciting investors in person, over the telephone, through the mails and through road show presentations. The Underwriter Defendants attended road show presentations with investors and Class members with the specific intent to solicit the purchase of China Dragon common stock in the Offering for defendants' own financial gain.

63.     Plaintiff Peter Van Nuis and the other members of the Class purchased or otherwise acquired China Dragon common stock directly from the Underwriter Defendants that was issued in the Offering pursuant to or traceable to the false and misleading Registration Statement and Prospectus.

64.     Plaintiffs did not know, or in the exercise of due diligence could not have known, of the untruths and omissions contained in the Registration Statement

1  and Prospectus.

2      65.    By reason of the conduct alleged herein, each of the Defendants have

3  violated §12(a)(2) of the Securities Act and Plaintiff Peter Van Nuis and members

4  of the Class have suffered damages as a result of such violations.

5      66.    Plaintiffs, individually and representatively, hereby elect to rescind

6  and tender to those Defendants named in this Count those securities that Plaintiffs

7  and other members of the Class continue to own, in return for the consideration

8  paid for those securities together with interest thereon. Plaintiffs and the other

9  members of the Class who have sold their China Dragon common stock seek

10  rescissory damages.

11     67.    This action was brought within one year after the discovery of the

12  untrue statements and omissions and within three years after the Offering.

13

14                              **THIRD CLAIM**
                    **Violations of Section 15 of the Securities Act**
15        **Against the Individual Defendants and Rappaport**

16     68.    Plaintiffs repeat and reallege each and every allegation contained

17  above as if fully set forth herein.  This claim is not based on, and does not allege,

18  nor does it sound in, fraud.

19     69.    This claim is asserted against each of the Individual Defendants, each

20  of whom was a control person of China Dragon during the relevant time period; and

21  against Defendant Rappaport, who was a control person of Defendant WestPark

22  during the relevant time period.

23     70.    For the reasons set forth above and pursuant to the first and second

24  claims, China Dragon is liable to the Plaintiffs and the members of the Class who

25  purchased China Dragon common stock in the Offering or pursuant and/or traceable

26  to the Registration Statement and Prospectus based on the untrue statements and

27  omissions of material fact contained in the Registration Statement and Prospectus,

28  under §11 and §12(a)(2) of the Securities Act.

71.   The Individual Defendants were control persons of China Dragon by virtue of, among other things, their positions as senior officers, directors and/or controlling shareholders of the Company.  Each was in a position to control and did in fact control China Dragon and the issuance of the false and misleading statements and omissions contained in the Registration Statement and Prospectus.

72.   Defendant Rappaport was a control person of WestPark during the relevant time period because, as alleged above, Rappaport was the sole owner and CEO of WestPark during the relevant time period.

73.   Neither the Individual Defendants nor Rappaport made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects.  Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

74.   This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after China Dragon common stock was sold to the Class in connection with the Offering.

75.   By reason of the misconduct alleged herein, for which China Dragon and WestPark are primarily liable, as set forth above, the Individual Defendants and Rappaport are jointly and severally liable with and to the same extent as China Dragon and WestPark pursuant to Section 15 of the Securities Act.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action, and certifying Plaintiffs herein as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Class Counsel;

Amended Class Action Complaint for Violation of the Federal Securities Laws

b. Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

c. Awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 17, 2011                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

_____

Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiffs and the Class

29

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against China Century Dragon Media, Inc. ("CDM"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.     I have reviewed the complaint against CDM and certain of its officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.     I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.     I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.     The following is a list of all of the purchases and sales I have made in CDM securities during the class period set forth in the complaint.  I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 1000 | 2/11/2011 | $5.25 | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM:  (212) 202-3827

5.     I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.     I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of August, 2011.

Signature: _____

Name:     Peter Van Nuis

Address: ██████████████████████

Phone:   ██████████████████████

E-mail:  ██████████████████████

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

# CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against China Century Dragon Media, Inc. ("CDM"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint against CDM and certain of its officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.      I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales I have made in CDM securities during the class period set forth in the complaint.  I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |

*SEE ATTACHED*

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM:  (212) 202-3827

5.     I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.     I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _26TH_ day of ___May___, 2011.

Signature: _____

Name:     JULIUS SHAPIRO

Address:

Phone:

E-mail:

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

2

Name:
JULIUS SHAPIRO

## Shares Purchased

|  | Number of Shares: | Buy Date: | Price Per Share: |
|---|---|---|---|
| **transaction:** | 4001 | 2/8/2011 | 5.31 |
| **transaction:** | 1049 | 3/18/11 | 4.80 |

## Shares Sold

| Number of Shares: | none | Sell Date: | Price Per Share: |
|---|---|---|---|

# Exhibit 1

**Corporate Structure**

The corporate structure of the Company is illustrated as follows:



Our subsidiary, CD Media (HK) Limited ("CD Media HK"), is a holding company with no operations at this time.  Its operations are not subject to PRC laws and regulations.

SOURCE:  China Century Dragon Prospectus at page 8.